PEOPLE OF PORTO RICO, Plaintiff and Appellee, v. ANTONIO RODRÍGUEZ, Defendant and Appellant.

No. 2779. Argued June 4, 1926.—Decided July 8, 1926.

Rafael Arjona Siaca for the appellant. José E. Figueras, Fiscal, for the appellee.

MR. CHIEF JUSTICE DEL TORO delivered the opinion of the court.

The pertinent part of the information in this case reads as follows:

"That on the 11th of August, 1925, on Buena Vista Street within the Municipal Judicial District of Yauco, which forms part

of the Judicial District of Ponce, P. R., the said defendant, who is the owner of a bakery where bread is made for sale and public consumption, unlawfully, wilfully, and maliciously, then and there made and sold bread adulterated with acid, according to a certificate of Dr. R. del Valle Sárraga, Director of the Chemical Laboratory, to which on August 11th sample No. 41,132 was sent and proved to be adulterated with 8.41 per cent of acid and so poorly made that it was detrimental to public health and, therefore, in violation of section 1 of Health Regulation No. 53.''

When the case was called for trial the defendant moved the court to strike out the part of the complaint beginning with the words, ''according to a certificate,'' and ending with ''Health Regulation No. 53.'' The court sustained the motion and thereupon the words ''detrimental to public health'' were stricken out.

The evidence consisted of the testimony of local health officer Manuel Vidal, who stated that he had seized the bread in the bakery of the defendant and had sent it to the Insular Laboratory, and of assistant chemist Gadea of the Insular Laboratory, who identified the report of the Laboratory and explained how the conclusion contained therein was reached. He did not say a single word to indicate that the bread was obnoxious to health or unfit for food. The report, also introduced in evidence, shows the following ''Conclusion: Acid, poorly made,'' and states that the portion of acid was ''8.41 for 10 grams.'' It does not say that the bread was adulterated or that it was unfit for consumption or injurious to health. Nor that the acidity was above the standard which might have been established under the law.

That was the evidence for the prosecution. There was no evidence for the defense. In rendering its judgment of conviction the court said that it found the defendant guilty ''because from the evidence introduced and according to the examination made at the Laboratory, it found that the bread was deleterious to health, inasmuch as it contained an excess of acidity.''

The defendant was accused and convicted of violating section 1 of. Health Regulation No. 53, regarding storage and sale of food and drugs in the Island of Porto Rico, promulgated on May 10, 1917. It reads as follows:

"No person, syndicate, corporation or institution of whatever character it may be, shall sell, offer, expose or hold for sale or transport or store, any food or drug whatever, for consumption in the Island of Porto Rico, if it be adulterated or misbranded, within the meaning of these terms as defined in this Regulation, which is the same as that expressed in Articles 7 and 8 of the Food & Drug Act, approved by the Congress of the United States on June 30, 1906."

The word "adulterate" as used in relation to this case is defined by Webster's International Dictionary as "debased by the admixture of a foreign substance; adulterated; hence, spurious; counterfeit," and by Zerolo's *Diccionario Enciclopédico de la Lengua Castellana* as "to vitiate or falsify something."

The Federal law referred to in the regulation establishes by its section 7 six different groups of cases in which food is considered adulterated within the meaning of the law. In the first five groups are the elements of mixture, addition, extraction, substitution or vitiation, more or less essential to adulteration. The sixth is as follows:

"Sixth.—If it consists in whole or in part of a filthy, decomposed, or putrid animal or vegetable substance, or any portion of an animal unfit for food, whether manufactured or not, or if it is the product of a diseased animal, or one that has died otherwise than by slaughter." Federal Food and Drugs Act and Decisions, compiled by C. A. Gwinn, page 11.

This case could perhaps fall within the sixth group, but the acidity of the bread would have to be of such a nature as to imply at least decomposition.

That part of the information which tended to express that idea in words more or less plain and susceptible of being understood by an uneducated defendant, that is, "detrimental

to public health," was stricken out, and in their testimony the witnesses said nothing in current language to indicate that the bread in question was decomposed and unfit to be used as food. Unless from the degree of acidity shown by the analysis it should be necessarily concluded that the bread was decomposed or unfit for food, which was not shown by the prosecuting attorney, it must be concluded that the evidence was at least defective.

Many laws prescribe standards for certain articles and if the article falls short it is considered to be adulterated regardless of whether something has been added or subtracted or whether it is fit or unfit for consumption. See the Act prohibiting the adulteration of milk, the decisions of this court in relation thereto, and 3 C. J. 2.

In addition to the foregoing Gadea, the chemist, testified that from the literature regarding the matter he knew that a degree of 3½ or 4 per cent was the maximum acidity fixed for bread and that the Insular Laboratory "which was more lenient, allowed up to 5½ per cent," but this chemist also said that he was not informed as to whether the resolution of the Laboratory had been adopted and published.

Therefore, considering this case from any point of view, it is a necessary conclusion that under the wording of the complaint and the insufficiency of the evidence the judgment appealed from should be reversed.